In the Matter of the Estate of GLADYS B. KNOX, Deceased.

Surrogate's Court, Kings County, June 2, 1937.

*Francis L. Archer*, attorney *pro se* and for The National City Bank, as accountant, trustee.

*Samuel H. Rossman*, for the respondent objectors, Dorothea K. Fulton and Gladys K. Menoher, life beneficiaries under the trusts.

*Charles J. Buchner*, special guardian for infant contingent remaindermen.

WINGATE, S. The manner of submission of the present controversy is comparable to an oasis in a desert of bitter and acrimonious litigation. Counsel for one of the interested parties has incorporated in his memorandum a brief, succinct and yet comprehensive, statement of the pertinent facts, and all have executed a stipulation that the facts thus stated " are in all respects true and correct."

The litigation concerns a subject which, in certain aspects, has given rise to great diversity of legal opinion, namely, the right of life tenants to an apportionment upon the sale of unproductive real property forming a part of the corpus of a trust.

The essential facts in the present case are that the will of the testatrix, who died in 1929, aside from certain small specific bequests, erected her entire estate into a trust for the life benefit of her two minor daughters, with remainder to their issue, further providing that if either should die without issue, the entire income should be payable to the survivor with remainder to her issue. In the event of the death of both without issue, $1,000 of the remainder is to go to charity and the balance to a cousin and a friend. The fiduciaries were granted a discretionary power of sale. At the time of the execution of the will and the death of the testatrix, more than half in value of her assets consisted of a large country estate which had at all times been wholly unproductive, and during the entire period from the death of the testatrix to the time of its sale in the fall of 1936, yielded a gross revenue of only $185 which fell far short of its expenses of maintenance. The disbursements of the trustees for this purpose totalled upwards of $8,000 and have been paid preponderantly from income of the trust, but have also been partly contributed by the life tenants from their own funds.

The account failed to provide for the repayment to the life tenant daughters of the sums thus advanced by them and deducted from their income, or to apportion any part of the sales price to recompense them for the loss of income sustained during the continued retention of this unproductive asset. The life tenants have objected on these grounds. Since there is no question on the facts, and the controversy is solely between the life tenants and the contingent remaindermen, the trustees have very properly adopted a wholly neutral attitude. The money was undoubtedly properly and necessarily expended in the maintenance of the property and the only question raised is as to the account to which it is to be charged.

In *Matter of Rowland* (155 Misc. 826), in which a somewhat similar question was involved concerning apportionment of charges for maintenance of realty which was productive at the date of the will and at the date of death of the testator but later became unproductive by reason of unforeseen subsequent occurrences, this court attempted to deduce certain rules of adjudication from previous appellate pronouncements respecting the situations in which apportionment would, and would not, be directed. The principles thus deduced were stated at page 831 as follows:

" A. Carrying charges of unproductive real property will be apportioned between income and principal, or the sales prices of such property will be apportioned between life tenant and remainderman:

" 1. If there is an imperative direction for sale thereof contained in the will, or

" 2. If it is inferable from the situation of the testator at the time of the drawing of the will that he desired that arrangement to be made.

" B. An intention to have such apportionment made will be imputed to the testator:

" 1. If the life tenant was a primary object of the testator's bounty, and

" 2. If the testator knew that the inclusion of the property in question would wholly or materially destroy the value of the gift."

The Appellate Division did the surrogate the honor of unanimous " approval of the reasoning and conclusions in his opinion " (248 App. Div. 627). The Court of Appeals reversed, with two judges taking no part (273 N. Y. 100).

The crux of the adverse determination is found at page 109 of the opinion of Judge HUBBS which reads as follows:

" The learned surrogate has in effect held that an intent to have an apportionment will only be imputed to the testator where the testator knew that the inclusion of the property in question would wholly or materially destroy the value of the gift.

" It seems to us that it would be at least as reasonable to assume an intent that the power should be imperative as to property known to be productive but which later becomes unproductive. We think under the facts of this case the existence of an intent that the power of sale was to become imperative upon failure of productivity with likelihood of continuance of that status, may be imputed to the testator. The life tenant was primarily the object of the testator's bounty. While he knew that the real property was productive he also knew that its productivity depended upon the continued existence and prosperity of the Continental Iron Works  *  *  *. It is not to be presumed that if he had foreseen the dissolution of the corporation and the surrender of the lease, with the resultant substantial loss of income to his wife, he would not have given an imperative power of sale which would result in saving so much as possible of the income to his wife or would not have provided that if the property be held, the carrying charges should be paid out of principal pending a sale of the property."

The sole disturbing feature of the determination of the Court of Appeals is found in the concluding statement that the intent of the decision " is not to lay down a general rule " and that it " is based on the facts of the particular case," since this leaves litigants and *nisi prius* courts in a quandary as to whether the facts of any given controversy will be viewed by the court of last resort as warranting a conclusion that in a given situation an intention may be imputed to a testator in respect to a situation which had not

occurred and which was unforeseeable except on the supposition that the scrivener possessed prophetic vision usually deemed lacking in ordinary mortals.

Were it not for the express contrary statement found on page 108 of the opinion, it might be deemed that the Court of Appeals was tending, by judicial legislation, to the adoption of the more logical and, in most cases, more salutary rule inferentially advocated in volume 1, sections 240, 241 of the Restatement of the Law of Trusts, requiring apportionment in all cases of such holdings, at least where the life beneficiary was an especially cherished object of the testator's bounty.

Such a thought would be far less disconcerting than the alternate conceptions which are deducible from the opinion, namely, *first*, that a positive intention is to be read into a solemnly executed document in respect to a matter which was beyond the knowledge, or imagination of the testator, so far as disclosed from the document or deducible from the circumstances surrounding him at the time of its execution; or, *second*, that the entire subject is in each specific instance determinable only in the court of last resort.

If, as has been so frequently stated, the primary object of judicial decision is to formulate rules of conduct for the guidance of the community (*Matter of Smallman*, 138 Misc. 889, 902; *Matter of Freeman*, 139 id. 301), it is to be hoped in the interest of the general public and of subordinate tribunals alike that the subject may be clarified either by the Court of Appeals itself or by legislative action without undue delay.

For the purposes of the present case, the *Rowland* decision is of immediate importance only as demonstrating that if any general alteration has been made by it in the law as it was previously generally believed to exist, it has been in the direction of a liberalization in favor of life tenants who were the primary objects of the bounty of the testator.

Under the facts in the present case, the life tenants would have been entitled to exoneration from carrying charges and to an apportionment of the sales price of the unproductive realty, even under the applicable pronouncements prior to the *Rowland* decision.

An additional feature is, however, here present in the fact that as each of the life beneficiaries attained her majority, she executed a general release to the trustees in lieu of a judicial settlement of their accounts as a preliminary to the receipt of previously accrued income. This was, however, in both instances, prior to the sale of the unproductive asset. It is urged by the special guardian that the giving of these releases precludes any recovery, at least as to those portions of income utilized for the maintenance of the property prior to that time.

As these releases are in substantially identical form, that of Dorothea K. Fulton, executed on October 28, 1932, will alone be made the subject of comment. This recites the making and probate of the will, the erection of the trust, the judicial settlement of the accounts of the executors, their qualification and receipt of the assets as trustees, the use of part of the income of the trust for the current maintenance of the unproductive property, the attainment of majority by the beneficiary, her desire for an extra judicial intermediate settlement of the accounts of the trustees, the submission to and acceptance by her of such an account and the statement of the balance of income in the hands of the trustees and the portion thereof due the releasor. After these recitals, the daughter expressly accepts " said account as an account stated final and conclusive;" accepts the sum of $750.71 as in full satisfaction (with a presently immaterial exception) " of all sums * * * owing to me " on the date of the release and expressly discharges the trustees " of and from all liability, responsibility or accountability for or by reason of their said trusteeship or for any matter or things growing out of or in any way connected with their trusteeship."

By virtue of the stipulation of facts, it is conceded that the purpose of this mode of settlement was to enable the releasor to obtain the portion of the income due her and remaining in the hands of the trustees, without the delay and expense of a judicial settlement of the accounts of the trustees. " The intent of the parties at the time of the execution of these releases was simply to approve the administration by the trustees of such funds as had already come into their hands and to protect the said trustees from liability to the same extent as they would have been protected by a decree of this court approving the amounts of their actual receipts and disbursements of moneys."

This is conclusive respecting the effect of these documents, since it is established that " a release is to be construed according to the intent of the parties and the object and purpose of the instrument, and that intent will control and limit its operation " (Whittemore v. Judd L. & S. Oil Co., 124 N. Y. 565, 574), wherefore their acknowledgment that the trustees were accountable only to the extent disclosed may not be metamorphosed into an assignment to the contingent remaindermen of rights which had not yet accrued to the persons executing the releases. No benefit to such remaindermen was contemplated; they were not parties to the transaction and were conceivably not yet in being.

The utmost effect which might reasonably be attributed to the releases is that they affected a settlement of the accounts of the trustees with the same result which would have been accomplished

by the entry of a decree of intermediate judicial settlement of the accounts. *Matter of Jackson* (258 N. Y. 281, 288) is a direct authority in point that such a decree, under the circumstances here present, would not effect an estoppel against the life tenant on a subsequent accounting after the sale of the unproductive asset.

It follows that the life beneficiaries must be sustained in all of their contentions. They are presently entitled to reimbursement from the proceeds of the sale of the unproductive property of all sums advanced by them or retained from their other income for the maintenance of the property and they are also entitled to income at the rate of four per cent (*Matter of Jacobs*, 154 Misc. 362, 363, 364; *Matter of Ayvazian*, 153 id. 467, 477; *Matter of Pelcyger*, 157 id. 913, 941) on the net sales price from one year from the date of death of the testatrix, which is determined to have been the time reasonably allowable for liquidation, to be computed in the manner specified in section 241 of the Restatement of the Law of Trusts. (*Matter of Rowland*, 273 N. Y. 100, 110.)

Enter decree on notice in conformity herewith.